UNITED STATES DISTRICT COURT
DISTRICT OF KANSAS
(Kansas City Docket)

**UNITED STATES OF AMERICA,**
Plaintiff,

v.   Case No.  23-20012-HLT

**SCOTT W. ANDERSON,**
Defendant.

## GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION FOR NEW TRIAL

Defendant moves for a new trial on all counts, alleging the Government committed prosecutorial in two statements during rebuttal closing argument. Neither comment was improper. However, because the Court gave an instruction to the jury that the attorney's comments are not evidence, and because the evidence of Defendant's guilt is overwhelming, even if improper, a new trial is not warranted.

**RELEVANT FACTS**

*The Charges*

The Second Superseding Indictment contained fourteen counts against Defendant. Counts one through four each charged making a false statement to a financial institution in violation of 18 U.S.C. § 1014. Although counts one and two related to two separate SBA backed bank loans, the alleged false statements were the same – Defendant falsely

1

stated in the applications that neither he nor any business he controlled were involved in any legal actions at the time, when he was actually involved in multiple lawsuits.

Counts three and four both related to false statements Defendant made on Payroll Protection Program loan applications. Again, although they were separate loans, the false statements were the same – that Defendant falsely stated that neither he nor any business was involved in bankruptcy, that neither Defendant nor any business he controlled was delinquent on an SBA loan, that neither Defendant nor any business he controlled had defaulted or was delinquent on an SBA loan within the preceding seven years, and that Defendant's companies did not have common management with any other business.

The remaining counts all centered around "future receivable sales agreements" Defendant entered into with a company called Itria Ventures. Under the terms of the agreements, Itria provided money to Defendant in return for his promise to give Itria money from future sales. Prior to approving the agreements, Itria required a funding phone call with the persons responsible under the agreement. Defendant and his business partners M.M. and J.R., entered into several such agreements with Itria prior to the Oakstar SBA loan.

M.M., J.R., and David Sloan, an employee of Defendant's each testified that the Oakstar SBA loan was obtained to consolidate debt, including some Itria agreements. Following the Oakstar loan Defendant, without M.M. and J.R.'s knowledge entered into additional Itria agreements and forged J.R. and M.M.'s name.  Defendant had Sloan, along with his employees Adam White and Brad Gilmore pretend to be J.R. and M.M. on the funding calls.  Counts five through eight each charged individual wire fraud counts for four different Itria loans. Count nine and ten charged aggravated identity theft related

to an email that Defendant sent forwarding personal identifying information for M.M. (count nine) and J.R. (count ten). The remaining aggravated identity theft charges all relate to the portrayal of M.M. during the Itria calls.

**The Trial**

The Government's theme of the case was presented in the first minute of its opening statement:

> The defendant, Scott Anderson, is an attorney and a restaurant owner. During the relevant time period to this case, he and his business partners owned restaurants in the Kansas City area, in Iowa, and one in Nebraska. *The evidence will show that when it came time to financing those restaurants, the defendant was serving up lies and deceit and deception.*

*Trial Trans*, Vol 1, at 145 (emphasis supplied).[1]

The Government called a number of witnesses at trial. Most relevant to Defendant's argument in his motion for new trial, are the testimony of M.M., J.R., David Sloan, Bradley Gilmore, Adam White, and Harrison Smalbach.

M.M. testified that he was aware of three "loans" he entered into with Itria. He recalled participating in three funding calls with an Itria representative for those three agreements. Trial Trans., Exhibit B, at 34-35. M.M. recalled those Itria transactions occurred before the Oakstar SBA loan. *Id*. at 36. M.M.'s understanding of the Oakstar loan was to consolidate existing debt, which included the Itria loans. Defendant told M.M. that after the Oakstar loan they would not take on any more short-term debt, because the Oakstar loan would be a cheaper payment. *Id*. at 38.

M.M. was shown the Itria agreements that were the subject of counts five through fourteen. He testified the signatures on the documents were not his, that he did not

---

[1] Because this transcript is sealed, the Government has not attached it as an exhibit.

participate in the funding calls, and that he was unaware of the transactions. M.M. testified he never gave anyone permission to pretend to be him in funding calls and the first time he learned of it was when he met with agents and a prosecutor in the U.S. Attorney's office. *Id*. at 41.

The Defendant introduced a document entitled "Global Buy-Sale Agreement/POA." Def. Ex. 1147. The document was dated November 1, 2012. It included a power of attorney that permitted Anderson to act as attorney-in-fact for M.M. on a variety of matters. Relevant here, it provided authority to act as power-of-attorney for "any loan application or related form or document to obtain a loan; and any promissory note, security agreement, or other document required for a loan that does not have a par amount that exceeds $250,000." The document included exceptions, and stated "…under no circumstances shall Anderson have the power to obligate [M.M.] to or sign any of the following: a. Any mortgage b. Any loan document where the principal amount borrowed exceeds $250,000; or c. Any document conveying any of [M.M.]'s interest in the Companies."

J.R. testified that he was aware of one Itria agreement and participated in the phone call. He was unaware of other agreements, and never gave anyone permission to pretend to be him in funding agreements. There was no Power of Attorney agreement related to J.R.

Adam White, Bradley Gilmore, and David Sloan were each Defendant's employees. They each testified that they participated in Itria funding calls in which the employees pretended to be M.M. and J.R. They each said Defendant was aware of this

4

fact and participated in each call. Neither White, Gilmore, or Sloan ever informed M.M. or J.R. that someone was pretending to be them on the calls.

Harrison Smalbach, an attorney at Itria, testified that Defendant never indicated to Itria that he was signing under power of attorney. *Trial Trans*., Vol 3 (Exhibit C), at 531. Smalbach testified that Itria would not have allowed someone to use a power of attorney to sign on behalf of someone on one of its future receivable sales agreements. Id. at 532.

Defendant testified. He acknowledged participating in every Itria funding call. *Trial Trans*, "Anderson" (Exhibit D) at 191.  Defendant said he knew others were pretending to be M.M. on the calls. Defendant testified he had no power of attorney for J.R. Id. at 170. He said he became aware of someone pretending to be J.R. when Defendant joined a phone call and Bradley Gilmore was pretending to be J.R, at the request of David Sloan. Id. at 171. However, despite the fact that Defendant was the boss and could fire Sloan and Gilmore, he did not take action and did not alert Itria. Id. at 171 – 172.

Defendant sent an email to Brad Gilmore and Adam White with identifying information for M.M. and J.R. so that Gilmore and White could pretend to be them on Itria calls. Id. at 193. Defendant acknowledged that, although he had their email addresses, he did not include M.M. or J.R. Id. He acknowledged that he had conference call capability and could conference anyone, no matter where they were in the world. Id. at 194. Defendant listened to the recorded phone calls, acknowledged that he knew others were pretending to be M.M. or J.R., and acknowledged that he never alerted Itria. Id. at 195-201.  He acknowledged when he said to the Itria representative that he would get

5

M.M. on the phone he was making and false statement, and when others said they were M.M. or J.R., he knew they were making false statements to Itria. Id.

Related to the submission of the PPP loans, during his testimony Defendant said that he submitted PPP loan applications to Academy Bank because he researched other banks online and realized he could submit the application to Academy without answering the PPP question related to bankruptcy. Id. at 154. He claimed he submitted the application online, without answering the bankruptcy question. Id. at 155.

**Government's Rebuttal**

The Government called two rebuttal witnesses, Mark McOsker and Weston Krska, both of whom were IT employees at Academy Bank. McOsker testified that he developed the software used to submit PPP loan applications to Academy Bank and it was not possible to submit a PPP application to the bank if the bankruptcy question was left blank, unless someone hacked the bank's computer system. *Trial Trans*., "Rebuttal" (Ex. E) at 5-7.

Mr. Krska testified that he reviewed the data associated with the submission of Defendant's PPP loans and that the loans were each marked "no" on the bankruptcy question at the time they were submitted to the bank. Id. at 20.

**Government's closing**

In its closing argument, the Government continued the theme of "lies, deceit, and deception."

> Have to prove the defendant acted with the intent to defraud. An intent to deceive or cheat someone. The defendant admitted to you, yes, I deceived Itria when I say, "hey, Marc." Let me get Marc on the phone." That's deceit. That's deception. A representation is false if it is known to be untrue or is made with reckless indifference as to its truth

or falsity. The defendant told you that he knew it wasn't [M.M.] on the phone.

*Trial Trans.*, Vol "Govt Closing," (Exhibit F) at 11.

In discussing the identity theft counts related to the usage of M.M. and J.R.'s identities, the Government said:

> The defendant had the e-mail address for the business partners, [MM] and [JR]. If [JR] and [MM] knew and acquiesced and wanted the defendant to pretend to be them, why wouldn't the defendant include them on this e-mail?  It's because the defendant was deceitful and deceptive. And [MM] and [JR] did not know about these particular loans.

Id. at 14.

Towards the end of closing, the Government returned to its theme:

> When I started opening statement, I said to you that the evidence would show that when it came time -- and I said that the defendant was a restaurant owner and an attorney. And that the evidence would show that when it came time to finance defendant's restaurant business, the defendant was serving up lies and deceits and deception. I submit to you, yesterday, when he took the stand, that he tried to serve up to you a bowl of deceit and deception. He told you that he didn't mark box 25 -- or excuse me, question number one on the PPP applications, that he intentionally left that blank. And then today, you hear evidence from the person that actually wrote that software, that it was impossible. That the only way that you could do that is if you hacked into the system to get around the system.

Id. at 19.

The Government finished its closing statement:

> All the confusion. All the misunderstanding. All the, "well, I don't know what that request asks." Why is it that all the confusion is always to the defendant's benefit? It's never, "oh, I didn't understand the question so I gave you too much information." The answer is because he wasn't confused. He was knowingly deceptive and deceitful. And he lied to the government on those applications.

Id. at 20.

7

In discussing the alleged POA, the Government said, "If you have a POA and you're acting under the authority of a POA, you don't forge the other person's name, you sign, Scott Anderson." Id. at 15.

Defendant objected, arguing "There's no evidence to support that." Id. The Government continued:

> Use your common sense. Use your common knowledge. Regardless, that POA did not apply to these contracts. At bottom, he had no POA with [JR]. So it most certainly did not apply to the counts that involve [JR]. But [MM] took the stand and testified. Who else took the stand and testified to those calls? The people that were pretending to be [MM] and [JR]. And do you remember what I asked them? Did [MM] know that you were doing this? Did you have [MM]'s permission? No.

### Defendant's Closing Statement

In his closing argument, counsel for the Defendant said,

> And, in fact, they were talking about affiliation in PPP loans. That is specifically waived. The government witness said that. Our Exhibit 1104 said that. Mr. Anderson said that from the witness stand. So if the affiliation rules -- if *I'm blowing smoke, I'm sure we'll hear that from the government*.

*Trial Trans.*,Vol. "Defendant Closing" (Exhibit G) at 12 (emphasis supplied).

### Government's Rebuttal Argument

The Government's Rebuttal argument began:

> Mr. Fowler said if I'm blowing smoke, the government will tell you. Ladies and gentlemen, I'm here to tell you, he's blowing up smoke. It's smoke and mirrors because -- you know where that phrase comes from? Magicians, when they want you to look away so that the lady can hide or so that the real trick is going over here. Smoke and mirrors on this side to direct your attention over here so you don't see what's going on over there. When he wants to talk about things like affiliates and he wants to talk about, well, we didn't think we were going to lose any money. That's smoke and mirrors because he

>doesn't want you to look at the facts. He doesn't want you to look at the evidence. He doesn't want you to look at the law.
>
>Buckle up, I've got 20 minutes and I've got a lot of deceit and deception to get through. Let's start with -- can we please bring up Government's Exhibit 101. He just said he gave the money back. Where does that come from? That comes from Scott Anderson's testimony. Well, we'll get to whether or not you can believe Scott Anderson. What's the bank telling you? They froze the money for the two accounts.
>
>Can we go to the next page. Keep scrolling. This is the one that -- that the PPP money hits the account, and then he starts spending it. He starts spending it that day.
>
>Can we highlight the top part. The PPP loan advance comes in on the April 10th. Checks start going out on April the 13th. Couldn't get that money back. Yeah, he -- he testified that, well, I had some money some other place, and then I was going to eventually put it in there. But ladies and gentlemen, does the evidence show that you can believe what *Scott Anderson* says? No.

Id. at 20-21 (emphasis supplied).

>Later in rebuttal the Government argued:
>
>… He says it was idiotic to pretend to be other people on the phone calls. He says, well, idiotic doesn't necessarily make a criminal. And that's true, but let's talk about that comment, "it was idiotic." Why was it idiotic? Why should he not pretend to be somebody else on a phone call involving a FRSA with Itria? Because it's deceptive. *Because you're obtaining money through this FRSA through deception. Through lies. Through misrepresentation. Through deceit.* That makes it a crime. Yeah, it was idiotic. And it was a crime. It was wire fraud. So we can agree upon that. That was idiotic, but it was also criminal. It was wire fraud and it was identity theft.

Id. at 26 (emphasis supplied).

**ARUGMENT AND AUTHORITIES**

  **Rule 33**

  Rule 33 gives a court discretion to vacate a judgment and grant a new trial, "if the interest of justice so requires." Although a motion for a new trial is not held to as strict of a standard as a motion for judgment of acquittal, *United States v. Fritzel*, 5:18-CR-40058-HLT, 2019 WL 4670204, at *1 (D. Kan. Sept. 25, 2019), such a motion nonetheless "is not regarded with favor and is only issued with great caution." *United States v. Herrera*, 481 F.3d 1266, 1269-70 (10th Cir. 2007); *accord United States v. Sinclair*, 109 F.3d 1527, 1531 (10th Cir. 1997). Indeed, the court should not grant a new trial even if it believes that a different result would be more reasonable. *Fritzel*, 2019 WL 4670204, at *1.

  **Prosecutorial Misconduct in Closing Argument**

  "Prosecutorial misconduct violates a defendant's due process rights if it infects a trial with unfairness and denies the defendant the right to a fair trial." *United States v. Sweet*, 107 F.4th 944, 961 (10th Cir. 2024) (quoting *United States v. Currie*, 911 F.3d 1047, 1055 (10th Cir. 2018)). Prosecutorial misconduct can cause constitutional error in two ways. *Id*. First, it can prejudice a specific constitutional right in a way that amounts to a denial of that right. *Id*. Secondly, "a prosecutor's misconduct may in some instances render a trial so fundamentally unfair as to deny a defendant due process." *Id* (quotation omitted).

  Defendant does not claim the Government's argument improperly prejudiced a specific constitutional right. He must prove the Government's arguments were so unfair as to deny him due process.

The analysis of alleged prosecutorial misconduct in argument is a two-step process. The reviewing court must first determine if the prosecutor's comments were improper and, if it determines they were, "examine the likely effect of the comments on the jury's verdict." *Currie*, 911 F.3d at 1055.

The comments Defendant alleges were misconduct both occurred during the Government's rebuttal and were in response to comments defense counsel made. "[C]onsiderable latitude is given the prosecutor in closing argument in replying to an argument raised by defense counsel's closing statement." *United States v. Janus Indus.*, 48 F.3d 1548, 1558 (10th Cir. 1995). Further, courts "should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations." *Donnelly v. DeChristoforo*, 416 U.S. 637, 647 (1974).

### 1. *The POA comment was not improper.*

Defendant argues the Government's comments about the alleged POA was improper because, "[t]hese comments, with no evidence in the record to support them, told the jury that to accurately execute a POA Mr. Anderson had to sign his own name, not M.M.'s." Defendant does not allege this assertion is legally wrong. Moreover, there was evidence presented that to sign under a power of attorney, an attorney in fact should disclose the power of attorney. During the cross examination of Defendant, Defendant's knowledge of the law on POAs was discussed.

> Q. Are you familiar with Kansas statute annotated 58-655?
>
> A. No.
>
> Q. You don't know that Kansas law requires an attorney in fact acting for the principal under power of attorney shall clearly

>indicate the attorney in fact's capacity?
>
>A. We're talking about a power of attorney on an Iowa resident that was executed in the state of Iowa. I don't know why we care about what Kansas law says.

Ex. D at 169.

Later, the Government asked about guidance from the American Bar Association related to power of attorneys:

>Q. You're aware that the American Bar Association gives guidance that states that if you're acting as power of attorney, you should indicate so on the signature, correct?
>
>A. One, it's guidance that says "should." Two, I've never even been a member of the American Bar Association, I certainly haven't read any of their guidance.

Id. at 170.

There was no error in the Government arguing that Defendant should have disclosed that he believed he was acting under a power of attorney. The statement was not a misstatement of the law, there was evidence presented to support the assertion, and it was proper to argue the jury could use common sense to determine that Defendant should have disclosed that be believed he was operating under a POA.

Even if the Government's statement was error, a new trial on all counts is unwarranted because, as more fully discussed below, any error was harmless. Because the POA was relevant only to certain counts, even if not harmless, any error would not affect all counts, or even all the aggravated identity counts. Defendant admitted that he had no power of attorney for J.R. Id. at 170. Therefore, the comment about the POA would not be relevant to Count 10 (the email Defendant sent with JR's personal identifying information). The POA only provided for loans, and the Itria Future

12

Receivable Sales Agreements were not loans. But, even if they were covered by the POA, the POA specifically excluded loans above $250,000, and the July 25, 2018 Itria agreement was in the amount of $312,500. Gov. Ex. 57. Therefore, the POA would not be applicable to Counts 6 and 12. Any error would not have affected those counts, or the false statement to a bank charges contained in counts one through four.

2. ***The "smoke and mirrors" and the "deceit and deception" comments were not improper.***

The Government's comment about "smoke and mirror" occurred in rebuttal, in response to Defense Counsel's statement in his closing, "If I'm blowing smoke, I'm sure we'll hear that from the government." When evaluating whether a statement is improper, the Court must view the statement in context, including whether it is in reply to defense counsel's comments. *United States v. Sweet*, 107 F.4th 944, 963 (10th Cir. 2024). "We have repeatedly recognized that considerable latitude is given to the prosecutor in closing argument in replying to an argument raised by defense counsel's closing statement." *Id* (internal quotation omitted).

Defendant claims the Government's comments about "smoke and mirrors" constitutes misconduct, but he acknowledges the Tenth Circuit disagrees. He cites *United States v. Graham*, 314 Fed. Appx. 114, 118 (10th Cir. 2008), which is directly on point. In *Graham*, a very similar smoke and mirrors analogy was used in rebuttal closing by the prosecutor after defense counsel had commented on there being much smoke but little fire in the prosecutor's case. In addition to acknowledging the prosecutor's statement was in direct response to defense counsel's comments, the Tenth Circuit specifically held that the smoke and mirrors comments did not call defense counsel's

13

character or truthfulness into question. "We see little of concern in this exchange of metaphoric rhetoric." *Id*. at 118.

Defendant also complains about the Government's comment at the beginning of rebuttal argument, "Buckle up, I've got 20 minutes and I've got a lot of deceit and deception to get through." Defendant tries to portray the comment of "deceit and deception" as a personal attack on counsel, ignoring the Government's theme of its case – when it came to financing Defendant's restaurants, he was "serving up lies, deceit, and deception."

This is clear not only from the theme in the Government's opening and closing argument, but in the statements that followed the "I've got a lot of deceit and deception to get through." After that comment, the Government focused on Defendant's conduct, not defense counsel's. "He just said he gave the money back. Where does that come from? That comes from Scott Anderson's testimony. Well, we'll get to whether or not you can believe Scott Anderson." Ex. F at 20.

Although personal attacks on defense counsel can at times constitute prosecutorial misconduct, (See *Wilson v. Sirmons,* 536 F.3d 1067, 1119 (10th Cir. 2008), it is clear that the "lies, deceit, and deception" argument focused on Defendant's conduct, not his attorney.

### *3. Even if either comment was improper, a new trial is unwarranted under a harmless error analysis.*

Prosecutorial misconduct does not warrant a new trial if it was harmless error. *United States v. Harlow*, 444 F.3d 1255, 1265 (10th Cir. 2006). A non-constitutional error, such as the one alleged here, "is harmless unless it had a substantial influence on

the outcome or leaves one in grave doubt as to whether it had such an effect." *Id* (quotation omitted).

The Court instructed the Jury that arguments of counsel are not evidence. Instruction fourteen specifically stated, "Nothing else is evidence. The lawyers' statements and arguments are not evidence." *Jury Instructions*, doc. 70, filed 11/14/24 at 26. The Court must assume that the jury follows the Court's instructions. *United States v. Anaya*, 727 F.3d 1043, 1059 (10th Cir. 2013) (finding harmless error despite prosecutor impermissibly telling jurors to feel anger toward the defendant, where Government's case against the defendant was strong and trial court instructed jury that statements and arguments of counsel are not evidence.)

The evidence of Defendant's guilt is overwhelming. The Government proved that at the time Defendant applied for both Oakstar and Landmark SBA guaranteed loans there were multiple pending lawsuits against Defendant. As to the PPP loan applications, the Government's evidence proved three separate false statements on both loan applications – the Defendant lied about bankruptcy; the Defendant lied about defaulting or being delinquent on the SBA loans; and the Defendant lied about common management structure of his businesses. The POA comment had absolutely nothing to do with either the SBA guaranteed loans or the PPP loans and had absolutely no effect on the jury's determination of counts one through four.

The POA was only relevant to the wire fraud and aggravated identity theft counts. To prove wire fraud, the Government had to prove (1) Defendant devised a scheme to defraud (including a scheme to derive another of money); (2) he acted with specific intent to defraud; (3) he used an interstate wire for carrying out the fraud; and (4) the scheme

15

employed false or fraudulent pretenses, representations, or promises that were material. Jury Instructions, doc. 70 at 29.

During cross-examination Defendant admitted nearly every element of the offense. He acknowledged his statement, "I've got him on the phone" to Itria was false and misleading. Ex. D at 200. In fact, during his testimony he repeatedly acknowledged that he made false and misleading statements to Itria. Id. at 196:18-22; Id. at 198:11-12, 20-21; Id. at 200: 8-11; and Id. at 201:2. The Defendant admitted that he received money as a result of the Itria agreements (Id. at 197:11) and that the money was sent via wire transfer from Itria's bank in New York to his bank in Kansas. Id. at 197:13

Defendant testified that he knowingly made false statements and misrepresentations to Itria when he conducted the funding calls with his employees pretending to be M.M. and J.R. Defendant admitted to sending those employees an email with M.M. and J.R.'s personal identifying information for the purpose of the funding call, without disclosing it to M.M. and J.R.

Because the evidence of Defendant's guilt is overwhelming, any error in either of the two isolated comments was harmless.

## CONCLUSION

The Government's comments in rebuttal closing were not misconduct. But, even if the Court were to conclude otherwise, any error was harmless. Defendant's motion for new trial should be denied.

RESPECTFULLY SUBMITTED,

DUSTIN J. SLINKARD
Acting United States Attorney

*/s/ D. Christopher Oakley*

D. CHRISTOPHER OAKLEY
Assistant United States Attorney
500 State Avenue, Suite 360
Kansas City, KS 66101
Ph. 913-551-6730
Fax 913-551-3541
Chris.Oakley@usdoj.gov
Ks S.Ct.No. 19248

## CERTIFICATE OF SERVICE

I hereby certify that on February 6, 2025, the foregoing was electronically filed with the clerk of the court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record in the above-captioned case.

*/s/ D. Christopher Oakley*
D. CHRISTOPHER OAKLEY
Assistant United States Attorney